**Paul Y. KIRIHARA, Plaintiff,**

v.

**The BENDIX CORPORATION, Fram Corporation and FC Corporation, Defendants.**

**Civ. No. 2819.**

United States District Court
D. Hawaii.

Oct. 21, 1969.

David Berger, Philadelphia, Pa., Kashiwa & Kashiwa, Honolulu, Hawaii, for plaintiff.

J. Russell Cades and William M. Swope, of Cades, Cox, Schutte, Fleming & Wright, Honolulu, Hawaii, Charles F. Donnelly and B. G. Andrews, Detroit, Mich., of counsel, for defendants.

PENCE, Chief Judge.

## STATEMENT OF THE CASE

To this action for treble damages brought under § 4 of the Clayton Act, defendants, at the pleading stage, have moved to dismiss under Rule 12(b), F.R.Civ.P., for failure to state a cause of action.

Plaintiff's amended complaint alleges that he, Kirihara, for some thirty years prior to May 23, 1967, was the exclusive warehouse distributor in Hawaii of Fram brand Automotive Oil Filters. He sells auto parts, but sales from Fram filters represented the major portion of his business and was the only brand of oil filters which he stocked and sold.

Defendant Fram Corporation[1] is the third largest filter manufacturer in the United States.[2] Defendant Bendix Corporation (Bendix) is one of the largest sellers of automotive products in the United States, but in 1966–67 Bendix manufactured no automotive filters but did purchase some for resale to some vehicle manufacturers. Bendix is a leading manufacturer of liquid separators and aerospace filters—items also manufactured by Fram. Bendix' sales in 1966 (from all products sold by it) were over $1 billion and Fram's were over $66 million.[3]

---

1. For the purpose of this decision, defendant Fram Corporation and FC Corporation are considered as one and the same and will be called "Fram".

2. AC Division of General Motors and Purolator Products, Inc. are larger, and the three account for over one-half of the filter sales in the United States.

3. Fram's automotive filters are marketed through approximately 2300 warehouse distributors, 18,300 automotive jobbers, and over 300,000 retail outlets.

In February 1967 Bendix and Fram agreed upon the acquisition of Fram by Bendix, with the transfer of assets from Fram to Bendix to be consummated about June 30, 1967. On May 23, 1967 Fram cancelled Kirihara's warehouse distributor agreement effective as of May 31, 1967, and the verbal agreement between the two that Kirihara was to be the exclusive distributor of Fram's products in Hawaii was also cancelled as of the same date.[3A]

Charles W. Carter Co., Inc. (Carter), a Hawaii corporation, had been a Bendix distributor prior to 1967 (and still is), and a competitor of Kirihara. Upon cancelling Kirihara's Fram distributorship, Fram, on June 1, 1967 made Carter the exclusive warehouse distributor for Fram products, and thereafter Bendix-Fram refused to sell Fram products to Kirihara. Carter and Bendix-Fram have agreed that Carter will not distribute any automotive filters other than Fram. Carter has the exclusive warehouse distributorship of Fram automotive filters in Hawaii, and since June 1, 1967 Carter and Bendix-Fram have kept their agreement in operation. Bendix-Fram prices to Carter for Fram's products are "unreasonably and discriminatorily low * * lower than those prices at which the defendants sell 'Fram' products of like grade and quality" to distributors on the mainland U.S.A.

On June 30, 1967 the Federal Trade Commission (FTC) charged that the acquisition of Fram by Bendix violated § 7 of the Clayton Act, and § 5 of the FTC Act. On December 19, 1967 the FTC noted the consummation of the merger, for the purpose of its complaint. Bendix agreed with the FTC that the business and assets of Fram should be continued as a separate and independent competitive entity pending the termination of the FTC action.

Kirihara then concludes that: (a) the merger actions constitute an unlawful conspiracy and substantially restrain and lessen competition, and "tend to create a monopoly in the production, sale and distribution of automotive filters aerospace filters and liquid separators in the United States"; (b) the agreements between Bendix, Fram and Carter were a conspiracy in the restraint of trade in the production, sale and distribution of automotive filters, etc. (see *supra*); (c) Bendix and Fram have attempted and are attempting "individually and/or in concert, to monopolize the production, distribution * * * [etc.] of automotive filters * * * [etc.]" (see *supra*); (d) the Bendix-Fram conspiracies have eliminated actual and potential competition between Bendix and Fram in the manufacture and sale of automotive filters, etc., and have lessened competition in the filter field generally, having eliminated Fram as an independent competitive factor; (e) concentration in the manufacture, sale and distribution of filters has been and will be increased substantially; and (f) the merger results in a competitive advantage to the defendants with detriment to actual and potential competition, curtailing the entrance of new firms and growth of smaller filter manufacturing companies, as well as lessening actual and potential competition among distributors of automotive filters, with a dangerous probability of defendants acquiring a monopoly of the filter business.

Kirihara then maintains that he has been "substantially, irreparably and permanently injured in his business and property" by the above unlawful conspiracies and agreements between Bendix, Fram and Carter, in that (a) he has lost the major portion of his business by virtue of the cancellation of his Fram distributorship; and because he cannot continue to distribute Fram products; (b) he cannot compete with defendants and Carter or other similar competitors in the distribution and sale of oil filters; (c) his filter business "has effectively been destroyed"; and (d) Bendix-Fram's unlawful acts prevent his "profitable and

3A. Throughout his decision, this cancellation, etc., is treated as a joint Bendix-Fram act.

effective re-entry into the" profitable filter market in Hawaii.

Plantiff therefore asks that: (1) Bendix-Fram be enjoined from merging; (2) the merger agreement be rescinded; and (3) Kirihara be reinstated as Fram's exclusive distributor in Hawaii and be awarded treble damages under Clayton § 4. (15 U.S.C. § 15).

## DEFENDANTS' MOTION

Defendants have moved to dismiss the complaint basically on the grounds that (1) the complaint violates Rule 8, F.R. Civ.P.; and fails to state a claim upon which relief can be granted under (2) Sherman Act §§ 1 and 2 (15 U.S.C. §§ 1, 2), (3) Clayton Act § 3 (15 U.S.C. § 14), (4) Clayton Act "Section 2(a) of the Robinson-Patman Act (15 U.S.C. § 13 (a)) [sic],"[4] and (5) Clayton Act § 7 (15 U.S.C. § 18).

## PROBLEMS RAISED

1. *Violation of Rule 8, F.R.Civ.P.*

The complaint, thankfully, is more than a simple sketch or notice pleading. This court believes that in potentially complex cases, particularly in cases involving violations of the antitrust laws, the plaintiff should go beyond the "short" requirements of Rule 8 if necessary to present a "plain", i. e., understandable and factual statement of the alleged antitrust violations. The pleading in this case is nowhere near as prolix and as overburdened with immaterial allegations of immaterial facts and conclusatory statements as this court found in Bailey's Bakery, Ltd. v. Continental Baking Company, 235 F.Supp. 705 (D.Hawaii 1964). The amended complaint here is but 13— not 78—pages long, and the facts alleged have materially assisted this court in resolving the motion to dismiss. Although not carefully drafted, and clearly hastily compiled in parts,[5] it cannot be dismissed as violative of Rule 8.[6]

Defendants' motion to strike the complaint as violating Rule 8, F.R.Civ.P., is denied.

2. *Violation of Sherman §§ 1 and 2.*

In his memorandum in support of his complaint, plaintiff states [7] (a) that he has alleged that Fram is one of the three largest manufacturers of automotive filters in the United States; (b) that Bendix is one of the largest manufacturers of automotive filters in the United States; [8] (c) that Bendix manufactures or purchases for resale automotive filters;[9] (d) that Bendix and Fram are competitors, and in some instances potential competitors in automotive filters, aerospace filters and liquid separators; [10] (e) "that Fram,

---

4. Both plaintiff and defendants have played tick-tack-toe with Robinson-Patman §§ 1 and 3, 15 U.S.C. § 13(a) and 15 U.S.C. § 13a, to the confusion of all. The court is satisfied, however, that the section plaintiff intended to claim was violated is in fact 15 U.S.C. 13(a). This is § 1 of the Robinson-Patman Act as it amended § 2 of the Clayton Act. See Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958).

5. See footnotes 11, 12 and 13, *infra*.

6. Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F.2d 1 (9 Cir. 1963), cert. denied, 385 U.S. 976, 87 S.Ct. 507, 17 L.Ed.2d 438 (1966).

7. Plaintiff's Brief Contra Motion to Dismiss the Complaint, p. 11.

8. This is not alleged. Plaintiff's allegation number 9 is that "Bendix is one of the largest *sellers* of automotive products in the United States" (emphasis added); and number 10: "For a number of years up to and including the early 1960's, Bendix manufactured and sold automotive filters * * *. Presently, Bendix purchases some automotive filters for resale * * *."

9. This is half correct. Plaintiff alleged purchase for resale—not manufacture. See n. 8 *supra*.

10. This is misleading. Plaintiff's allegations numbers 11, 12 and 13 allege competition between Bendix and Fram in aerospace filters and liquid separators and that Bendix has been interested in acquiring an automotive filter manufacturing concern.

Bendix and others" [11] entered into an unlawful agreement and conspiracy that Fram would merge into Bendix, and Fram would terminate plaintiff as its distributor in Hawaii and transfer the exclusive distributorship of Fram products in Hawaii to Carter. Plaintiff argues that the effects of these *two* agreements were to substantially restrain competition and that defendants have attempted thereby to monopolize the "production, sale and distribution of automotive filters"; (f) that he has lost a major portion of his business, is unable to compete "with defendants" [12] and his filter business has been destroyed; (g) that defendants' business is enhanced and defendants have prevented plaintiff from re-entering the market for sale and distribution of oil filters.

Then plaintiff concludes: "The aforementioned allegations * * * [show] a concerted activity in terminating and refusing to deal with appellee [sic]." [13]

Plaintiff has cited Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1961), as supporting its contention that summary dismissal of its Sherman § 1 count is improper. As the Court stated:

> "Poller alleges and the affidavits, depositions, and exhibits indicate much more than the free exercise by CBS of the granted right of cancellation. A conspiracy is alleged to restrain trade in the Milwaukee television market; to eliminate WCAN from that market; to secure its facilities at depressed prices; and to occupy the UHF band in that market exclusively. The right of cancellation was merely one of the means used to effectuate this conspiracy." 368 at 469, 82 S.Ct. at 489.

It is manifest from the pleadings that the only possible market in which the plaintiff can have any interest here is the automotive filter market in the State of Hawaii. There is no allegation or inference that the alleged "conspiracy" or combination between Fram and Bendix was to restrain trade in the Hawaii automotive filter market, to eliminate plaintiff from that market; to secure his facilities at depressed prices; or to occupy the State automotive filter market exclusively. All that can be determined from the pleadings is that the defendants took away plaintiff's Fram dealership and gave it to a Bendix dealer, Carter. Nothing else is pled—nothing more appears—from the pleadings. *Poller,* rather than supporting plaintiff's position, points out the weakness thereof anent plaintiff's Sherman §§ 1 and 2 counts.

Accepting his complaint as true, it is obvious that plaintiff lost all of his prior business in the sale of Fram filters in the Hawaii automotive filter market. This is the normal, natural and expected result in every case where a distributorship is terminated by any manufacturer or supplier. His allegation that he is unable to compete with defendants Bendix-Fram is obviously true, but it has no application to the facts pled. He never did compete with the defendants Bendix or Fram. He bought from Fram. He never did operate on a competitor level with either Fram or Bendix. That plaintiff's Fram filter business has been destroyed clearly appears from the complaint. Just how defendant Fram's business has been correspondingly enhanced does not appear and could not appear from the complaint because one would assume that whatever business he did in Fram filters could be but transferred over to his successor. Standing alone, the fact that he went out of the Fram business should produce no competitive reason for the enhancement of the sale of Fram filters. While it is also manifest that the defendants have prevented plaintiff from re-entering the market for the sale and distribution of Fram filters, it nowhere factually ap-

---

11. The only "others" described anywhere in the pleading is Carter, Bendix' distributor in Hawaii.

12. The only defendants here are Bendix and Fram.

13. The above illustrates the danger of copy work without thought.

pears that they have prevented him from re-entering the market for the sale and distribution of any other make of filter, or that entry into the automotive filter market in Hawaii was in any way foreclosed to him by the termination of his Fram contracts.

In support of his claim that he has stated a cause of action under Sherman §§ 1 and 2, plaintiff cites Fashion Originators' Guild of America v. FTC, etc.[14]

This court has just received the September 8, 1969 opinion of the Court of Appeals for the Ninth Circuit in Joseph E. Seagram and Sons, Inc. (et al.) v. Hawaiian Oke and Liquors, Ltd., 416 F.2d 71,[15] in which certain liquor lines were taken away from Hawaiian Oke by the House of Seagram, Inc., and its three competitive divisions—Calvert, Four Roses and Frankfort—and, along with the liquor lines of Barton Distilling, given to McKesson and Robbins, Inc., thus effectively terminating the distributorship of Hawaiian Oke. The Ninth Circuit held:

"Not every agreement is *per se* 'in restraint of trade' within the meaning of section 1 * * *. Thus, it is well settled that it is not a *per se* violation of the antitrust laws for a manufacturer or supplier to agree with a distributor to give him an exclusive franchise, even if this means cutting off another distributor * * *. [See the plethora of cases cited therefor.]

"It is no doubt true that a manufacturer or supplier can do many things independently which he may not combine with others to accomplish * * * [See cases cited.] But the mere fact of combination or 'conspiracy' does not necessarily result in *per se* liability.

"We turn, then, to the group boycott cases on which plaintiff relies. Such boycotts have been held to be illegal *per se* under section 1 because they are 'naked restraints of trade *with no purpose except stifling of competition.*'" 416 F.2d at 76.

Thereafter the Court of Appeals listed every case cited by plaintiff herein and one-half dozen more—all of which are group boycott cases or exclusion of competitors from the market of monopolistic practices violative of Sherman § 2.

All of the cases cited by plaintiff here are clearly distinguishable from the allegations of the plaintiff. In each and every one there was an element of purpose to coerce the trade policy of third parties or to secure their removal from competition.[16] There is nothing in plaintiff's factual allegations which indicate in the slightest that Fram and Bendix combined for the primary purpose of excluding Kirihara from any market— Hawaiian or otherwise. There is no allegation of fact that Bendix and Fram by transferring the Fram distributorship to Carter excluded Kirihara from selling any other automotive filter save and except Fram. As the pleadings indicate, outside of the three leaders in the automotive filter field, only slightly less than 50% of the national market is held by an

14. Fashion Originators' Guild of America v. F.T.C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); Eastern States' Retail Lumber Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); United States v. Columbia Steel Co., 334 U.S. 495, 522–523, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959);

Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Ford Motor Co. v. Webster's Auto Sales, Inc., 361 F.2d 874 (1 Cir. 1966).

15. This court was reversed.

16. See Barber in "Refusals to Deal Under the Federal Antitrust Laws," 103 U. of Pa.L.Rev. 847 (1955), at 876–77, as noted in Hawaiian Oke, supra, 416 F.2d at 77.

unspecified number of independent filter manufacturers.

■ No anti-competitive motive for termination of Kirihara as their distributor, Bendix vis-à-vis Fram, or Bendix-Fram vis-à-vis Kirihara, can even be inferred from the allegations.[17] Plaintiff has pled, at best, no more than an *Ace Beer* case,[18] Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6 Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), not a Perryton Wholesale, Inc. v. Pioneer Distributing Co. of Kansas, 353 F.2d 618 (10 Cir. 1965), cert. denied, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966), nor a Walker Distributing v. Lucky Lager Brewing Co., *supra* n. 6. Giving the pled facts their broadest inference, the naked charge that Bendix-Fram conspired with Bendix' Hawaiian distributor, Carter, for Fram to take away plaintiff's Fram distributorship and give it to Carter, does not state a Sherman § 1 violation. Such a simple "conspiracy" to substitute one distributor for another, even if proven, would not violate Sherman § 1.

Although the complaint speaks extensively of the national impact of the merger, the only market in which the plaintiff here could conceivably have any interest is the Hawaiian market—not the national market—and there is nothing factually in the complaint to indicate that he has been foreclosed of any portion of the automotive filter market in Hawaii, save and except the right to distribute Fram filters. There is no factual allegation in any wise indicating that Fram has a monopoly on the automotive filter market in Hawaii or that the taking away of the Fram distributorship forecloses him from competing with Fram in that market in Hawaii, or that Fram by the single change of distributorship from plaintiff to Carter is attempting to monopolize the entire automotive filter market in Hawaii. Plaintiff's allegation of competition between the "big three" automotive filter companies and the almost 50% of the market remaining open to independents forecloses any conclusion of violation of Sherman § 2—under the allegations of plaintiff's complaint.

Defendants' motion to dismiss the Sherman §§ 1 and 2 counts is granted.

3. *Violation of Clayton § 3.*

■ Plaintiff, in alleging he has stated a Clayton § 3 (15 U.S.C. § 14) claim, apparently refers to his allegation 34: "Carter and defendants have conspired and agreed that Carter will not sell or distribute any automotive filters which are not 'Fram' products * * *." The court can only guess at this because in plaintiff's answering memorandum to defendant's instant motion, although headed "1. Sections 3 and 7 of the Clayton Act"—thereafter never even mentions § 3![19] The "exclusive dealing" aspects of Clayton § 3 concerns itself with coercion of buyers or with dealing arrangements that preempt outlets by foreclosing competitors from a market.[20] Although the complaint verbalizes that plaintiff is a competitor of Bendix-Fram, the facts alleged conclusively show he is not. Neither is he a buyer who might possibly be coerced by the exclusive dealing arrangement Bendix-Fram has made with Carter.

Here, certainly, plaintiff has not pled any facts from which he could show injury under Clayton § 3.

Defendants' motion to dismiss plaintiff's Clayton § 3 count is granted.

---

17. See Instant Delivery Corp. v. City Stores Company, 284 F.Supp. 941 (E.D. Pa.1968).

18. See Scanlan v. Anheuser-Busch, Inc., 388 F.2d 918 (9 Cir. 1968), cert. denied, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed. 2d 654 (1968).

19. Plaintiff's Brief Contra Motion to Dismiss the Complaint, pp. 6–9.

20. Lessig v. Tidewater Oil Company, 327 F.2d 459 (9 Cir. 1964), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed. 2d 1046 (1964); Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9 Cir. 1955).

#### 4. *Violation of Clayton § 2(a).*

In spite of the confusing nomenclature used by both plaintiff and defendants as indicated above,[21] it is manifest to the court that plaintiff did intend to include a count charging the defendants with violation of § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act § 1, 49 Stat. 1526, 15 U.S.C. 13(a).[22]

There is no question that a treble damage action may be maintained under this section.[23] As this court reads the plaintiff's complaint, it is probably paragraph 36 upon which plaintiff predicates his allegation of a Clayton § 2(a) violation.

> "36. The prices at which defendants have sold and continue to sell 'Fram' products to Carter are unreasonably and discriminatorily low, and are lower than those prices at which defendants sell 'Fram' products of like grade and quality to other distributors purchasing such products in the continental United States."

The only referent to possible damage from such sale at "discriminatorily low" prices is in paragraph 42(b):

> "Plaintiff has been and will be unable to compete with the defendants and their subsidiaries * * * in the distribution and sale of oil filters generally."

As set forth in *Utah Pie, supra,* n. 22, § 2(a)· does not forbid price competition which will probably injure or lessen competition by eliminating competitors, discourage entry into the market or enhance the market shares of the dominant sellers, but it does provide that sellers may not sell like goods to different purchasers at different prices if the result may be to injure competition in either the sellers' or the buyers' market unless such discriminations are justified as permitted by the Act.

Plaintiff here was never a competitor of the seller, Fram. After his Fram distributorship was terminated, he was no longer a customer of Fram. Nowhere in the pleadings does it appear that as a result of the "discriminatorily low prices" granted Carter by Fram, that Carter has in any way lowered the prices of Fram's filters so as to injure either plaintiff as a potential competitor of Carter, i. e., in the sale of Fram's filters, in Hawaii, or any other filter distributor in Hawaii. He has not factually alleged that the discriminatorily low price given Carter, even though lower than that on the mainland, has had any anti-competitive impact[24] on the automotive filter market in Hawaii—the only market with which this count of the complaint can have any possible application in fact.

It might be that plaintiff could plead a cause of action under Clayton § 2(a) in re the buyers' market in Hawaii but he has not done so. On the pleadings however, the only relevant market within which this count could have any application is the automotive filter market in Hawaii and there is nothing in the pleadings to indicate that the market structure has in any wise been injured or *any* automotive filter distributor therein been injured because of any price differential in the sale of Fram filters to Carter in Hawaii at prices which are lower than the prices for the same product in the mainland United States. Plaintiff has failed to allege a cause of action under Clayton § 2(a) and defendants' motion to dismiss this count is granted.

#### 5. *Violation of Clayton § 7.*

Plaintiff's allegation of a Clayton § 4 treble damage claim for injury sustained because of a merger allegedly in violation of Clayton § 7, regenerates the still unresolved (by the Supreme Court)

---

21. See n. 4, *supra.*

22. See Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 687, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), n. 2.

23. *Utah Pie, supra* n. 22.

24. I. e., the effect required by the statute as an element of a cause of action. *Utah Pie, supra* n. 22, at 705, 87 S.Ct. 1326.

question of whether or no an acquisition violating Clayton § 7 can support a Clayton § 4 action.

In 1964, this court in *Bailey's Bakery, supra,* ruled upon the same problem in a different factual context and because Clayton § 7 was concerned with anticipatory effects which might flow from corporate acquisition, any damages claimed would be for prospective injury, thus purely speculative, and therefore concluded that a plaintiff could not state a cause of action for treble damages under Clayton § 7 for anticipated but unimplemented acts of restraint which might invade a plaintiff's interest.[25]

Five years later, the district and circuit courts are still split on the question.[26] When this court ruled on the problems in 1964, it was as a novitiate in the antitrust sect of the judicial priesthood. During the past five years this court has devoted the major portion of its time to antitrust problems, with correlative attempts to give the right interpretation to the Court's ofttimes delphic utterances in the antitrust field.[27] The Clayton § 7–§ 4 question having again been dropped into the hopper, this court therefore deems it necessary, in the light of the conflicting decisions, coupled with such inferences as may be drawn from the Supreme Court decisions before and since that date, to make its own complete reevaluation of the question.

When the legislative history of Clayton § 7 is reviewed, it shows that, as originally introduced, the Clayton bill's[28] purpose was "to prohibit certain trade practices which, * * * singly and in themselves, are not covered by [the Sherman Antitrust Act] * * * and thus * * * to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation."[29] And in attempting to satisfy President Wilson's admonition that the restrictive practices should be prohibited "in such terms as will practically eliminate uncertainty,"[30] the bill attached *criminal* penalties to several sections, viz.:

Section 2, the crime of price discrimination, which then required an attempt to injure a competitor;

Section 8 (now § 7), the crime of acquiring another business outright by purchasing its stock when "the effect *is* to eliminate or substantially lessen

25. 235 F.Supp. at 717.

26. Pro: Dailey v. Quality School Plan, Inc., 380 F.2d 484 (5 Cir. 1967); Gottesman v. General Motors Corp., 414 F. 2d 956 (2 Cir., decided Aug. 13, 1969) (reversing *Gottesman, infra*); Julius M. Ames Co. v. Bostitch, Inc., 240 F.Supp. 521 (S.D.N.Y.1965). Contra: Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725 (8 Cir. 1964); Gottesman v. General Motors Corp., 221 F.Supp. 488 (S.D.N.Y.1963); Utah Gas Pipelines Corp. v. El Paso Natural Gas Co., 233 F.Supp. 955 (D.Utah 1964); *Bailey's Bakery, supra;* Dairy Foods Inc. v. Farmers Co-op. Creamery, 298 F.Supp. 774 (D.Minn.1969); Isidor Weinstein Investment Co. v. Hearst Corp., 303 F. Supp. 646 (N.D.Cal., filed Aug. 29, 1969).

27. United States v. E. I. du Pont de Nemours & Co. (Cellophane), 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); United States v. E. I. du Pont de Nemours & Co. (General Motors), 353

U. S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957): Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); United States v. Aluminum Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); Minnesota Mining and Manufacturing Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 85 S. Ct. 1473, 14 L.Ed.2d 405 (1965); United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

28. H.R.Rep.No.15657, 63d Cong., 2d Sess. (1914).

29. H.R.Rep.No.627, 63d Cong., 2d Sess. 1 (1914).

30. Message to Congress, Jan. 20, 1914, 51 Cong.Rec. 1163 (1914).

competition or create a monopoly (emphasis added)." [31]

Section 4 (now § 3), the crime of exclusive dealing, required neither intent nor actual monopolistic effects. The original Clayton bill contained outright prohibitions and passed the House in that form.[32] Meanwhile, the Senate had passed the bill creating the FTC after inserting § 5 prohibiting "unfair methods of competition," and the Trade Commission bill was passed by the House and signed by the President while the legislative struggle between the Senate and the House over the Clayton bill still went on.[33] The Senate felt that the FTC was fully qualified to deal with the practices made criminal by the Clayton bill and no further legislation was needed. Therefore, the Senate Judiciary Committee deleted the criminal penalties from §§ 2 and 4 of the House bill in favor of enforcement by the FTC, and on the floor of the Senate struck out §§ 2 and 4 for the same reason. Then, of course, came the normal compromise between the divergent views of the House and Senate, and it was finally agreed in final compromise to strike out the criminal penalties of § 2 and to accept the amendment forbidding discriminating practices when the effect of such discrimination might be to substantially lessen competition or tend to create a monopoly. The same thing was done with reference to § 4 forbidding the exclusive dealing contract.[34]

The words "substantially lessen competition or tend to create a monopoly" were first incorporated in § 8, the holding-company provision of the Clayton bill, as it passed the House. Since the words were approved by the Senate in that section, when the modification of §§ 2 and 4 became necessary to make the acts prohibited therein unlawful without making them penal, the magic words of § 8 were applied to §§ 2 and 4 so that the three sections, 2, 4 and 8 (now §§ 2, 3 and 7, and hereafter so referred to) were in harmony.[35]

Section 2 of the Clayton Act was designed primarily to outlaw the practice of large corporations of using local price-cutting for the purpose of destroying a local competitor.[36] Section 3 of the Clayton Act prohibited certain kinds of contractual arrangements setting up the distributing or marketing method of a manufacturer; more specifically, exclusive dealing and tying arrangements are forbidden when the restricted freedom of the buyer to purchase from competing suppliers injures his competitive position or that of the competing supplier. Congress intended that §§ 2 and 3 should strike at the use of price discriminations and exclusive dealing and tying arrangements by the big corporations whose strength already verged on monopoly and not at smaller firms using such methods to cut down entrenched competitors.

Section 7 was originally intended to enable the Government to cope with secret acquisition of another business by purchasing the corporation's stock. The big holding companies were deemed the enemy of competition.

The legislative history makes it certain that the Clayton Act was an antitrust act. As indicated, it started as a bill to create three specific new crimes, thus following the example of the Sherman Act. Perforce its concept was changed because the specific practices singled out for prohibition were not always to be condemned. There was no purpose to outlaw the practices of either sections 2, 3 or 7 as illegal *per se*. The invalidity of a practice covered by the Act was not to be measured by any

---

31. In the Senate this was changed to: "where the effect may be to lessen competition." 51 Cong.Rec. 14,464 (1914).

32. 51 Cong.Rec. 9,911 (1914).

33. The President signed the FTC bill Sept. 26, 1914.

34. 51 Cong.Rec. at 16,273 (1914).

35. 51 Cong.Rec. at 16,317 (1914).

36. See n. 29, *supra*.

fixed legal yardstick. The qualifying clause as to the competitive effect was to enable the FTC as well as the courts to administer a broad discretion in implementing the intent of the Act.

The Court, in Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922), in an action under Clayton § 3, stated:

"The Clayton Act sought to reach the agreements embraced within its sphere in their incipiency, * * *.

* * * * * *

" * * * [W]e do not think that the purpose in using the word 'may' was to prohibit the mere possibility of the consequences described. It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly. That it was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial." 258 U.S. at 356–357, 42 S.Ct. at 362.

*Standard Fashion* is interesting in that Charles Evans Hughes argued the case in behalf of Standard Fashion. Hughes argued for an outright return to the broad inquiries of the Sherman Act rule of reason, i. e., inquiries as to the actual effects of the exclusive arrangements as they pertained to the peculiar economic effects of the pattern business. As indicated, this was rejected by the Court which found that the new Clayton Act had tests of its own. Without reviewing the cases under Clayton § 3 specifically (see Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 300–305, 69 S.Ct. 1051, 93 L.Ed. 1371), in each there was a requirement of some showing of circumstances hostile to competition beyond the fact of the practice itself.

The legislative purpose of § 2, as noted above, was to outlaw the practice of large corporations of local price cutting for the purpose of destroying a local competitor. It was not until 1936 that the Robinson-Patman amendment added the additional objective of the preservation of a plane of competition as distinguished from the preservation of competition itself, and its broad provisions go far beyond the more limited legislative objectives of 1914.[37]

The Court reaffirmed its previous conclusion in Corn Products Refining Co. v. Federal Trade Comm., 324 U.S. 726, 742, 65 S.Ct. 961, 89 L.Ed. 1320 (1945) that the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable probability that they may have such an effect.

"[T]he use of the word 'may' was not to prohibit discriminations having 'the mere possibility' of those consequences, but to reach those which would probably have the defined effect on competition." 324 U.S. at 738, 65 S.Ct. at 967.

Section 7, from 1914 until the Celler Amendment of 1950, permitted acquisitions in the form of the sale and purchase of business assets—to the complete negation of any implementation of the congressional intent of 1914. The demand of § 7, 1914 version, that for violation there be a substantial lessening of competition between the acquiring and the acquired corporations eventually brought about an adoption of the Sherman Act "rule of reason" into the decisional interpretation of § 7,[38] and the lower court decisions based upon *International Shoe* (n. 38) permitted a broad range of inquiries into the overall competitive effect of stock acquisitions.

The Celler Amendment of 1950 [39] extended the prohibition to the acquisition

---

37. See FTC v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948).

38. See International Shoe Co. v. FTC, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1930) ; Arrow-Hart & Hegeman Electric

Co. v. FTC, 291 U.S. 587, 54 S.Ct. 532, 78 L.Ed. 1007 (1934).

39. Act of Dec. 29, 1950, c. 1184, 64 Stat. 1120, 81st Cong., 2d Sess. (H.R. 2734, Public 899).

of a firm's assets and reworded the standard of legality under § 7. Congress was still concerned in the manner in which "the American economy has become concentrated and centralized in the hands of a few giant corporations * * *." [40] It was Congress' intention in 1950

"to reach effects beyond those prohibited by the Sherman Act, * * *.

"* * * [I]t was desired that the test be more inclusive and stricter than that of the Sherman Act * * * [but not] that the bill go to the extreme of prohibiting all acquisitions between competing companies.

*　　*　　*　　*　　*　　*

"The committee wish to make it clear that the bill is not intended to revert to the Sherman Act test. The intent here, as in other parts of the Clayton Act, is to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding. * * * By eliminating the provisions of the existing section that appear to reach situations of little economic significance, it is the purpose of this legislation to assure a broader construction of the more fundamental provisions that are retained than has been given in the past.

*　　*　　*　　*　　*　　*

"The act is to be violated if, as a result of an acquisition, there would be a substantial lessening of competition or a tendency to create a monopoly in any section of the country.

"* * * [A]cquisitions * * * will be unlawful if they have the specified effect in any line of commerce, whether or not that line of commerce is a large part of the business of any of the corporations involved in the acquisition." [41]

"Since it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition." [42]

"In determining the area of effective competition for a given product, it will be necessary to decide what comprises an appreciable segment of the market. * * *

*　　*　　*　　*　　*　　*

"Acquisitions are forbidden only where in any line of commerce in any section of the country the effect 'may be substantially to lessen competition or to tend to create a monopoly.

"The use of these words means that the bill, if enacted, would not apply to the mere possibility but only to the reasonable probability of the prescribed effect, * * *.

"A requirement of certainty and actuality of injury to competition is incompatible with any effort to supplement the Sherman Act by reaching incipient restraints." [43]

The history of the Celler Amendment makes it clear that Congress did not intend that the "rule of reason" of the Sherman Act should be read into this section. As the Court said:

"Taken as a whole, the legislative history illuminates congressional concern with the protection of *competition, not competitors,* and its desire to restrain mergers only to the extent that such combinations may tend to lessen competition." (Italicized in original.) [44]

"* * * Congress used the words '*may be* substantially to lessen competition' * * *, to indicate that its concern was with probabilities,

**40.** 1950–2 U.S.Code, Congressional and Administrative News, p. 4295 (81st Cong., 2d Sess. 1950) ; S.R.No.1775, and H.R. No.2734.

**41.** Id. at pp. 4295–4298.

**42.** Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 299–300, 69 S.Ct. 1051, 1055, 93 L.Ed. 1371 (1949), n. 5.

**43.** *Op. cit. supra* n. 40, at p. 4298.

**44.** Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

not certainties. [Footnote omitted.] Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act." (Italicized in original.)[45]

Be it well remembered that along with Clayton §§ 2, 3 and 7, Congress by §§ 4 and 16 also imbedded in the Clayton Act means whereby private persons could assist the Government in enforcing the provisions of "the antitrust laws."[46] This court has found nothing in the committee reports nor elsewhere in the legislative history of the Act directly concerning the application of § 4 vis-à-vis a § 7 violation, and this section has remained undisturbed by any subsequent amendment. The Court has stated on innumerable occasions that private litigation under those two sections is the strongest deterrent to violation of antitrust laws.[47]

It is with this background that we return to the problem before us.

There has never been any question since American Crystal Sugar Co. v. Cuban-American Sugar Co., 259 F.2d 524 (2 Cir. 1958), but that Clayton § 16 gave to private parties the right to use the injunctive process to restrain violations of Clayton § 7. That treble damage actions could be brought by private parties under Clayton §§ 2(a) and 3 is well established.[48] It is only in the use of Clayton § 4 as a means of restraining

acquisitions violating Clayton § 7 that there has developed resistance in the courts.[49] It may well be that this defense stems from a comparison of the very nature of a merger with the acts proscribed by Clayton § 2(a), i. e., price discrimination and price cutting and by Clayton § 3, i. e., "exclusive dealing and tying" arrangements. The obvious intent and result of any such latter acts, if carried to their logical end result, is the destruction of competition. It is easy to see the economic evils which may readily flow from such latter business moves.

Not so with mergers! Most acquisitions today are via the merger route and in the past few years the number of mergers, annually, has increased by leaps and bounds.[50] Merger, in all phases of life, both personal and business, is an accepted process for mutual betterment, be it in the form of marriage, social clubs, partnerships, joint ventures or business mergers between firms. Merger is one of the normal methods of business growth.

It is axiomatic that every agreement concerning trade, ergo, every merger, whether it be horizontal, vertical or conglomerate, produces some restraint, some change, and more and more often than not someone is in some way "injured"[51] by that merger. E. g., a supplier or a distributor is changed; an advertising media is dropped; new directors are named; an officer is released; a proposed plant is not built;

---

45. Id. at 323, 82 S.Ct. at 1522.

46. Cf. Nashville Milk Co., supra n. 4, holding that § 3 of the Robinson-Patman Act (15 U.S.C. § 13a) will not sustain a treble damage action.

47. Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 138–139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957).

48. E. g., Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954); Perkins v. Standard Oil Co. of California, 395 U.S. 642, 89 S.Ct. 1871,

23 L.Ed.2d 599 (1969); Englander Motors, Inc. v. Ford Motor Company, 267 F.2d 11 (6 Cir. 1959); Beloit Culligan Soft Water Service, Inc. v. Culligan, Inc., 274 F.2d 29 (7 Cir. 1960).

49. See cases cited, n. 26, supra.

50. Between 1950 and 1966, there were 183,504 business mergers. (34 ABA Antitrust L.J. 105.) Acquisitions among United States companies increased some 37% in 1967 to a record high of 2384. (37 ABA Antitrust L.J. 873.)

51. Albrecht v. Herald Co., 390 U.S. 145, 155, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

competitive pressure is increased; etc. The fact of "injury" to someone is so common that injuries of this nature are accepted as a part of normal business hazards, whether it be to an officer, employee, landlord, stockholder, or a competitor, etc. Merger after merger can take place with accompanying "injuries", without any violation of Clayton § 7 or right of private redress for such economic injury. Moreover, in contradistinction to the *"mens rea"* usually discernible in violations of Sherman §§ 1 and 2, and Clayton § 2(a) or § 3, in the great majority of mergers attacked as violative of Clayton § 7, not only can no *"mens rea"* be seen, but in many it was not until the case reached the Supreme Court that any violation at all was found! [52]

Undoubtedly the acceptance of mergers in the business world as a normal way of business life, plus a feeling that Clayton § 4, being of a penal nature, should be predicated upon some type of predatory anti-competitive intent before that penalty should be inflicted, has had great influence upon and, almost alone, has produced the reluctance on the part of some courts to permit a Clayton § 4 action to be brought for an alleged violation of Clayton § 7. Furthermore, due to the greater familiarity of most judges with Sherman §§ 1 and 2 violations, together with the fact that, as here, almost every Clayton §§ 4–7 count is conjoined with Sherman counts, there has been a not unnatural tendency to commingle the two and apply Sherman Act tests to Clayton § 7 violations.[53]

The Court itself has contributed to the confusion and controversy by clearly inferring in *Minnesota Mining, supra* n. 27, that a Clayton § 4 action could be based upon a Clayton § 7 violation, and thereafter in *Dean Foods* stating: [54]

"The Clayton Act contains specific and comprehensive enforcement provisions. There is no vacuum to be filled by ingenuity. There is no room for improvisation. The Act is fully armed with a triple arsenal. Enforcement powers with respect to mergers under § 7 are vested in the Department of Justice, the Federal Trade Commission and private persons who claim injury as a result of the merger. Both the Department of Justice and private litigants are authorized to seek injunctive relief in the district courts."—

thereby equally clearly inferring that injunctive relief is the only weapon of the private Clayton § 7 litigant. Furthermore, the following illustrates the confusion extant:

"Section 7 of the Clayton Act was intended to arrest the anticompetitive effects of market power in their incipiency. The core question is whether a merger may substantially lessen competition, and necessarily requires a *prediction of* [emphasis supplied] the merger's impact on competition, present and future. See Brown Shoe Co. v. United States, * * *; United States v. Philadelphia National Bank, * * *. The section can deal *only* [emphasis supplied] with probabilities, not with certainties.

52. *E. g.*, United States v. E. I. du Pont de Nemours & Co. (General Motors), *supra* n. 27; United States v. Philadelphia National Bank, *supra* n. 27; United States v. Von's Grocery Co., *supra* n. 27; United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966).

53. *Cf.* Gottesman v. General Motors Corp., 414 F.2d 956, at 961 (2 Cir., decided Aug. 13, 1969).
"The basis of the pre-trial ruling was that a section 7 violation can cause no

damage because it establishes only that harm was threatened, not that it occurred. But if the threat ripens into reality we do not see why there can never be a private cause of action for damages. If section 7 is designed to prevent acquisitions that 'may' or 'tend to' cause specified harm, such an acquisition may either itself directly bring about the harm or make possible acts that do."

54. FTC v. Dean Foods Co., 384 U.S. 597, 615, 86 S.Ct. 1738, 1748, 16 L.Ed.2d 802 (1966).

Brown Shoe Co. v. United States * * * at 323 [82 S.Ct. at 1522]; United States v. Penn-Olin Chemical Co., 378 U.S. 158 [84 S.Ct. 1710, 12 L.Ed.2d 775] [Cases cited at n. 27, *supra*.] And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play. *If the enforcement of § 7 turned on the existence of actual anticompetitive practices* [emphasis supplied], the congressional policy of thwarting such practices in their incipiency would be frustrated.

"All mergers are within the reach of § 7, and all must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate [footnote omitted] or other."[55]

To the same effect is the statement in United States v. Philadelphia National Bank, *supra* n. 27, and reaffirmed in United States v. Von's Grocery Co., *supra* n. 27:

"[Section 7] requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their 'incipiency.'" 374 U.S. at 362, 83 S.Ct. at 1741.

In an endeavor to refine some gold from the dross we must return to the basic congressional concern, which, as shown from the legislative history of both the original Clayton § 7 and its 1950 amendment, was the lessening of competition and the creation of monopolies, i. e., the elimination of competition.

Congress was concerned with the preservation of small competitors in any given market and was convinced that small business and the dispersion of economic power are salutary and should be encouraged both by the old as well as the new § 7.[56] This same interpretation underlies the decisions of the Supreme Court whereby any merger involving any more than a minimal percentage of the market has been held to be almost *per se* a violation of Clayton § 7.[57] An antipathy to big business has underlaid both the congressional deliberations and the Court's decisions.[58] The quantitative substantiality doctrine seems to have been the Court's basis upon which any horizontal merger should be struck down upon a showing, without more, that the acquired firm sold a substantial share of the goods in a relevant market.[59]

As is illustrated by this Court's decision in *Bailey's Bakery, supra,* legal logic based upon the stated intent that Clayton § 7 was to prevent restraints of trade and monopolies in their incipiency, i. e., before they had actually reached the Sherman Act level, led to the application of the tort-oriented rationale that there could and should be no recovery for an anticipated injury. This again was but a spillover of the Sherman Act tests and, as the court now feels, led this court into making the broad statement that a violation of Clayton § 7 could not support a treble damage claim.

As Justice Black said in *Perma Mufflers, supra:*

"We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes." 392 U.S. at 138, 88 S.Ct. at 1984.

55. FTC v. Procter & Gamble Co., 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967).

56. Bok, "Mergers and the Clayton Act", 74 Harvard L.Rev. 226, 247 (1960).

57. *Cf.* Brown Shoe Co. v. United States, *supra* n. 27; United States v. Von's Grocery Co., *supra* n. 27.

58. *Cf.* United States v. E. I. du Pont de Nemours & Co. (General Motors), *supra* n. 27; United States v. Pabst Brewing Co., *supra* n. 52; FTC v. Procter & Gamble Co., *supra* n. 55.

59. *Cf.* cases cited n. 57, *supra.*

■ This court in *Bailey's Bakery* used *the* rule of reason as applied to Sherman Act violations instead of using *a* rule of reason [60] more in keeping with the intent of Congress that less was needed to prove violation of Clayton § 7 than Sherman §§ 1 or 2, and that the broad purpose of Clayton § 7 was to *supplement* the basic Sherman Act. Congressional history also indicates that not every merger, no matter what its impact may be, potentially violates Clayton § 7.

■ As indicated above, mergers are a form of business growth and the vast majority of all such acquisitions involves ordinary business motives and purposes, with market control neither intended nor resulting. Congress was not concerned with those mergers. Neither was *it* concerned with mergers of small business firms. It was not concerned with the mating of ordinary cats, but only the matings or acquisitions by the big tigers, lions, and leopards in the business world. As the cases indicate, both the Department of Justice and the FTC have concerned themselves with acquisitions by the "big cats". No complaints were issued by the FTC against approximately 180,000 manufacturing corporations with assets of less than $5 million involved in mergers in 1950–1966, and less than .5% of merging companies with assets of less than $25 million had any of their acquisitions challenged by the Commission during that period. It was to curb big business that Clayton § 7 was passed, and as previously indicated, the Court has now indicated [61] that the big cats are fair game for private treble damage guns for violation of Clayton § 7.[62]

From its historical analysis, conjoined with its meager gleanings from the Court's opinions,[63] this court is *now* convinced that to hold that Congress never intended the deterrent effect of § 4 to have any application to acquisitions which might violate § 7 upon completion, would absolutely negate the contrary inference which must be drawn from the fact that Congress has left § 4 unchanged and uncircumscribed since 1914.[64] This court now concludes that it threw too wide a loop when it said in 1964: "No private action for treble damages accrues from a Clayton § 7 acquisition." 235 F.Supp. at 717.

■ Having concluded that a treble damage complaint *can* be laid on an alleged Clayton § 7 violation, of course does not end the problem—neither here nor in any other case. As previously indicated, every business acquisition brings about change and with it, injury to someone. It is all too easy to state that Clayton § 4 allows "every person who has been injured", etc., to sue. This, of course, is not factually true. All courts have persistently held that the person injured must be within the target area of the alleged violation before he can state a claim thereunder, no matter how great his injury.

■ As was said in Conference of Studio Unions v. Loew's, Inc., 193 F.2d 51 (9 Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952), in order to state a cause of action under the antitrust laws, plaintiff must show more than that an act has been committed which harms him; he must show that he is within that area of economy which is endangered by a breakdown of competitive conditions in a particular industry.

In Karseal Corp. v. Richfield Oil Corp., *supra* n. 20, we read that "the rule is

60. See M. A. Adelman and Breck P. McAllister in "An Antitrust Handbook", ABA, Sect. Antitrust, 1958, pp. 206, 233.

61. *Minnesota Mining*, *supra* n. 27.

62. It must not be inferred from the above that a Clayton § 7 violation cannot be committed by a tabby cat.

63. *Minnesota Mining*, *supra* n. 27.

64. *Cf.*, however, *Nashville Milk Co.*, *supra* n. 46.

that one who is only *incidentally* [italicized in original] injured by a violation of the antitrust laws,—the bystander who was hit but not aimed at,—cannot recover against the violator",[65] and cited as examples shareholders, officers of corporations, creditors and landlords.[66] This *Karseal* "target area" rule was further expounded on in Twentieth Century Fox Film Corp. v. Goldwyn, 328 F.2d 190, 220 (9 Cir. 1964):

> "But in using the words 'aimed at' this court did not mean to imply that it must have been a purpose of the conspirators to injure the particular individual *claiming* damages. Rather, it was intended to express the view that the plaintiff must show that, whether or not then known to the conspirators, plaintiff's affected operation was actually in the area which it could reasonably be foreseen would be affected by the conspiracy."[67]

Manifestly, therefore, whenever the plaintiffs are the direct and primary objectives of the antitrust violation they have a standing to sue.[68] But the target area in most cases is not so simply ascertained, nor, as this court views it, has there been any decisional definition of the perimeter of a § 7 target, to keep it within the basic congressional intent: that Clayton § 7 was to preserve *competition* and to stop the big corporations from curtailing it by acquisitions.

Sherman Act interpretations of the "target area" have their referent value, of course, as do decisions on Clayton §§ 2(a) and 3, but any interpretations of those sections must be evaluated in the light of the fact that there can be no *per se* violations of Clayton § 7 [69] if the "probability" concepts of that section are to be given any application. Moreover, if the rationale of the deterrent factor of § 4 vis-à-vis § 7 is valid, i. e., to arrest anti-competitive tendencies in their *incipiency*, then the parties to an acquisition, presumably having no *mens rea*, no predatory intent, are entitled to have some standards against which they can measure the probable impact of their plans and proposed operational changes upon the competitive components of the relevant market against the possibility of engendering a § 4 action, for the purpose of evaluating the potential overall dollar cost of the acquisition. They are at least entitled to a *calculated* risk. They certainly deserve an opportunity to preview the target area [70] and weigh the financial hazards that the actual merger may trigger off if it is found to have the proscribed effect.[71]

Even the basic problem of determination of the relevant market or markets against the impact of the merger is to be measured, also opens Pandora's box for both the trial and appellate courts.[72]

---

65. 221 F.2d at 363.

66. See also Seaboard Terminal Corp. v. Standard Oil Company of New Jersey, referred to in *Karseal*, 221 F.2d at 363.

67. See also Martens v. Barrett, 245 F.2d 844 (5 Cir. 1957); SCM Corp. v. Radio Corp. of America, 407 F.2d 166 (2 Cir. 1969).

68. Hoopes v. Union Oil Co. of California, 374 F.2d 480, 485 (9 Cir. 1967). *Cf.* Perkins v. Standard Oil Co. of California, 395 U.S. 642, 649, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969).

69. This court at this time refuses to dip into the "% of market" grab bag!

70. See Twentieth Century Fox Film Corp. v. Goldwyn, *supra.*

71. Here again is Pandora's box, e. g., when one notes that the El Paso Natural Gas

problem remained in litigation for over 12 years and Von's Grocery for 6 years, many were the changes in management, sources of supply, distributorships, reciprocity acts, all directly traceable to the merger, which undoubtedly took place. For other vexing problems see 56 Cal. L.Rev. 968, 980 et seq.

72. *Cf.* United States v. E. I. du Pont de Nemours & Co. (Cellophane), United States v. Philadelphia National Bank, United States v. Aluminum Co. of America, United States v. Von's Grocery Co., *supra* n. 27; United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); FTC v. Consolidated Foods Corp., 380 U.S. 592 (1965); United States v. Pabst Brewing Co., *supra* n. 52.

■ That to prove violation, the Clayton Act admits of a lower standard of proof of the same kind of acts which if carried to their logical result give rise to a Sherman Act violation, must not be overlooked.[73] Under § 7, as amended, it is unnecessary.

"to show that as a result of a merger the acquiring firm has *already* obtained such a degree of control that it possessed the power to destroy or exclude competitors or fix prices." [74]

## REQUIRED STANDARDS FOR A § 7– § 4 CLAIM

■ Having concluded that under certain circumstances a treble damage claim can be laid upon an alleged § 7 violation, it is necessary to determine the standards and define the perimeter of the "target area" required to implement the congressional intent of using § 4 as a special assist in arresting anticompetitive tendencies in their incipiency. In order to have a § 4 cause of action based upon an alleged § 7 violation, not alone must the claimed injury be directly and proximately caused by the proscribed acquisition, but also the injured must be one of the components of the competitive infra-structure of the relevant market involved in the complaint, be it in any section of the country, and the effect of such injury upon that component must validate the reasonable probability that a substantial anti-competitive effect upon the viability of competition in *that* market will flow from the condemned acquisition.[75] An injury to a component of minimal, i. e.,

non-effective, competitive significance therein,[76] was not intended by Congress to come within the perimeter of the above "target area" of a § 7 violation.[77] It is in the application of the above standards that the congressional grant to the courts of broad discretion in implementing the purpose of the Act places its greatest charge upon judicial talent.[78]

## PLAINTIFF'S § 7 CASE

It is axiomatic that the complaint, at this, its pleading stage, must be viewed in the light most favorable to the plaintiff, and this Clayton § 7 count, like the others, cannot be dismissed unless it appears to a certainty that the plaintiff would not be entitled to relief under any state of facts which could be proved in support of his claim.[79]

■ The facts here alleged show nothing more than that the Bendix-Fram merger was the cause of the termination of plaintiff's exclusive Fram automotive filter distributorship in the Hawaiian market and its transferance to Carter. That this caused loss of the Fram line and financial injury to Kirihara is sufficiently alleged. That the distributorship of Fram's filters may have been one of the components of the competitive infra-structure of the Hawaiian market may for the purpose of this ruling, be conceded. But Fram's line was not removed from the competitive picture by the merger. Bendix made no automotive filters; it, inferentially, through Carter, purveyed some other line in Hawaii—inferentially Wix. When Carter entered into an exclusive Fram sales

73. American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

74. H.R.Rep.No.1191, 81st Cong., 1st Sess. (1949), p. 8 (Emphasis added.)

75. *Op. cit. supra*, n. 40, n. 41, n. 43; see also the quote from *Von's Grocery*, p. 87 *supra*.

76. *Cf.* "situations of little economic significance", p. 84 *supra*.

77. Standard Oil Co. v. United States. , *supra* n. 17.

78. This court is aware that these standards probably conflict with *Dailey, Highland Supply*, and *Gottesman* on appeal, but probably confirm the result in *Gottesman* on the trial level, *Ames, Utah Gas Pipelines* and *Isidore Weinstein Investment Co.*, as well as *Bailey's Bakery*. See n. 26, *supra*.

79. Radovich v. National Football League, 352 U.S. 445, 453, 77 S.Ct. 390, 1 L.Ed. 2d 456 (1957).

agreement, the premerger, Bendix-supplied line of automotive filters perforce was released, and inferentially was up for grabs by anyone—including Kirihara. There is no allegation that he was foreclosed from selling *any* line other than Fram's.

In spite of loose allegations to that effect (see *supra*), Kirihara was never a competitor of Bendix or Fram. He was a competitor of Carter, but Carter is not a defendant nor a party to the merger. Although the complaint overflows with statements of the premerger competition between Bendix and Fram in aerospace and oil separator filters in the national market, the only relevant market of which Kirihara was a competitive component was the automotive filter market in the State of Hawaii.

The *Fram line*, of course, as one of the big three automotive filters (see n. 2, *supra*) was and is a major competitive component of that Hawaiian market. *Kirihara*, however, as a general distributor of automotive supplies having the line of Fram filters, upon the facts alleged, was at best a component of minimal competitive significance in that market, within the purview of Clayton § 7.

There is nothing factual in the complaint to indicate *any* probability that the removal of Kirihara as the Fram distributor will have *any* (not even inferentially substantial) anti-competitive effect upon the viability of competition in the Hawaiian market.

There is nothing in the facts alleged to indicate that competition, i. e., opportunities for fully competitive distribution of all the brands of automotive filters theretofore sold in the Hawaiian market, was or might be in any manner negatively affected by the merger.

Plaintiff has failed to state a cause of action under Clayton § 7 and defendants' motion to dismiss that count is granted.

Plaintiff having failed to state a cause of action under Sherman §§ 1 or 2, Clayton §§ 2(a), 3 or 7, the complaint is dismissed.

Although it appears doubtful that he can do so, there may be facts, herein not alleged, which might enable Kirihara to state an antitrust cause of action. Leave therefore is given plaintiff to file an amended complaint if he so desires. If none is filed within twenty (20) days from the filing of the order of dismissal hereunder, plaintiff's complaint will stand dismissed with prejudice.