**JUNEAU SQUARE CORP., Wil-Ten Co., Inc., Juneau Square Services, Inc., Ralph W. Conway, Hal Bradley & Associates, Inc., Emil Bartel, Anna Bartel, Vione Perry, as Administratrix of the Estate of Thomas H. Perry, Harold C. Smith, III, as Administrator of the Estate of Harold C. Smith, Jr. and Mildred B. Smith, Jack D. Moertl and John F. Spoden, Plaintiffs,**

v.

**FIRST WISCONSIN NATIONAL BANK OF MILWAUKEE, First Wisconsin Development Corporation, First Wisconsin Corporation, Marshall-Michigan Company, Inc., Marshall-Wisconsin Company, Inc., Aetna Life Insurance Company and the Aetna Casualty and Surety Company, Defendants.**

Civ. A. No. 72–C–533.

United States District Court,
E. D. Wisconsin.

Feb. 22, 1978.

George P. Kersten and E. Campion Kersten, Kersten & McKinnon, Milwaukee, Wis., for plaintiffs.

W. Donald McSweeney and John J. Voortman, Schiff, Hardin & Waite, Chicago, Ill., for First Wisconsin and Marshall-Michigan defendants.

James A. Urdan and William A. Stearns, Quarles & Brady, Milwaukee, Wis., for Aetna defendants.

## MEMORANDUM AND ORDER

WARREN, District Judge.

The remaining defendants in this action have filed a motion for summary judgment and a renewed motion for judgment notwithstanding the verdict. The motions are addressed to the standing of the plaintiffs to bring this action and to certain issues pertaining to the type of damages claimed.

In order to clarify the issues before the Court, a discussion of the proper scope of the inquiry into the plaintiffs' standing and into the nature of the damages claim is appropriate.

This action is brought pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15 (1970), and is based upon an alleged violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1970). The discussion will, therefore, be limited to standing under § 4. That section provides:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the

cost of suit, including a reasonable attorney's fee.

The subject of standing in antitrust actions has received a considerable amount of attention by the federal courts. The decisions have concerned themselves primarily with the interpretation of the "business or property" and "by reason of" language contained in § 4. Two approaches to the problem were developed. Some courts followed an analysis referred to as the "direct injury" approach, while others concentrated on the "target area" approach. *See, In re Multidistrict Vehicle Air Pollution M. D. L. No. 31,* 481 F.2d 122 (9th Cir. 1973) and cases cited therein.

The Seventh Circuit has recently expressed its view on the appropriate approach to standing in *Illinois v. Ampress Brick Co., Inc.,* 536 F.2d 1163 (7th Cir. 1976), rev'd on other grounds, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

The plaintiffs in *Ampress* were the State of Illinois and 700 local governmental entities in the Greater Chicago area, including counties, municipalities, housing authorities, and school districts. The defendants were manufacturers of concrete blocks. These blocks were sold to masonry contractors, who would submit bids to general contractors for the masonry portions of construction projects. The generals would in turn submit bids to the plaintiffs for the construction projects.

The plaintiffs contended that the defendants had conspired to fix the price of concrete blocks. They alleged that there were illegal overcharges contained in the price of the bricks sold to the masonry contractors. These overcharges, according to the complaint, arose by virtue of the price fixing conspiracy and were passed on to the plaintiffs.

The district court dismissed the claim on the basis of standing relying on the case of *Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co.,* 315 F.2d 564 (7th Cir. 1973). "[A]s to *ultimate* consumers, their injuries are too remote and consequential to provide legal standing to sue against the alleged

antitrust violator." *Illinois v. Ampress Brick Co., Inc.,* 67 F.R.D. 461 (N.D.Ill.1975), *rev'd,* 536 F.2d 1163 (7th Cir. 1976).

The Court of Appeals reversed the lower court on the issue of standing. It was careful to point out that causation was a question of fact and not an element of standing. It was this point which distinguished the *Commonwealth Edison* case on which the lower court had relied.

The method utilized by the court to find standing was borrowed from the Ninth Circuit.

To the extent that the district court held that these plaintiffs, as opposed to ultimate consumers in general, lack standing, we disagree. The plaintiffs here have alleged an injury in fact and are within the target area of the Sherman and Clayton Acts. They have shown that they were "within the area of the economy which [defendants] reasonably could have or did foresee would be endangered by the breakdown of competitive conditions." *Ampress Brick,* 536 F.2d at 1167, *quoting In re Western Liquid Asphalt Cases,* 487 F.2d 191, 199 (9th Cir. 1973), *cert. denied sub nom. Standard Oil Co. v. Alaska,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974).

The Seventh Circuit's decision in *Ampress* was reversed by the Supreme Court in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The issue as defined by the Court was "whether the overcharged direct purchaser should be deemed for purposes of § 4 to have suffered the full injury from the overcharge." The majority of the Court concluded that the answer was yes. "[W]e decline to abandon the construction given § 4 in *Hanover Shoe* —that the overcharged direct purchaser, *and not others* in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of the section . . . ." *Id.* at 729, 97 S.Ct. at 2066 (emphasis added). The plaintiffs, who were indirect purchasers and who "may have been actually injured by antitrust violations," were denied recovery because their business and property interests were not intended to be protected from the antitrust violation alleged. They were not within the class of persons intended by Congress to redress the violations asserted.

The Supreme Court refrained from categorizing the issue before it as falling within or without the question of standing. Footnote 7 to its opinion states:

Because we find *Hanover Shoe* dispositive, here, we do not address the standing issue, except to note, as did the Court of Appeals below, 536 F.2d, at 1166, that the question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4. *Id.* at 728, n. 7, 97 S.Ct. at 2066.

The analytical distinction referred to by the Supreme Court presents somewhat of an anomaly. While expressing no opinion on the circuit court's analysis of the plaintiffs' standing, the Court notes a distinction between the issue before it and the question of whether the injuries alleged were "too remote" for standing purposes. The Circuit Court opinion, however, states that "remoteness" is not an element of standing.

The Court of Appeals specifically rejected the standing approach utilized by the lower court, *i. e.,* an analysis of whether the injuries were too remote. It stated that causation is not an element of standing. The district court had used the term "remote" but it is clear from its opinion that it viewed the issue in terms of causation, relying on *Commonwealth Edison,* in which the Circuit Court, equating the two concepts, had stated: "[T]here was no direct proximate impact of the conspiracies on the consumers. The impact on them was remote . . . ." 315 F.2d at 567. It is equally clear that the Seventh Circuit recognized that the remoteness approach utilized involved the issue of causation. "The error in defendants' reading of . . . *Commonwealth Edison* is that they view the failure to show that antitrust violations *caused* plaintiff's injury as an element of standing. It is not. . . . To the extent that the

district court held that these plaintiffs, as opposed to ultimate consumers in general, lack standing, we disagree." 536 F.2d 1166–67 (emphasis added).

▎ There would, therefore, appear to be a distinction between the definition of the term "remote" as used by the Supreme Court and the definition of that term as used by the Circuit Court. Nonetheless, it remains clear to this Court that, in this circuit at least, causation is not an element of standing.

Footnote 7 of the Illinois Brick decision also seems to imply that the question of which persons have been injured for purposes of section 4 is outside the issue of standing. Such an interpretation, however, would appear contradictory to other opinions dealing with standing. The inquiry undertaken in Illinois Brick was an effort to determine whether Congress envisioned that § 4 would provide a remedy to the plaintiffs in view of the nature of the damages asserted. Hanover Shoe was utilized in part as an aid in determining legislative intent based on its stare decisis effect. See, 431 U.S. at 736, 97 S.Ct. 2061. This is precisely the same inquiry which the Supreme Court undertook in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), in order to determine the standing of the plaintiff to sue. See also, Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

The "legal interest" test goes to the merits. The question of standing is different. It concerns, apart from the "case" or "controversy" test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. Id. at 153, 90 S.Ct. at 830.

The Seventh Circuit's decision in Ampress Brick makes it clear that, in the opinion of that court, the question of whether the interest asserted by the plaintiff is protected by the antitrust laws is a question of standing.

In private actions seeking to vindicate rights conferred by Congressional enactment, to establish standing the plaintiffs must show an injury in fact that is "arguably within the zone of interests to be regulated by the statute." Id. at 1164, quoting Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

The difference of opinion between the Circuit Court and the Supreme Court in Illinois Brick was on the question of whether the "business or property" interest asserted by the plaintiffs were intended to be protected by § 4 in light of the violation charged, i. e., whether this class of plaintiffs were protected.

In view of the Supreme Court's statement that it expressed no opinion on standing in Illinois Brick and the discussion of the history of that case as set forth above, this Court would conclude that, in this circuit, the scope of the standing issue under § 4 is as it was set forth in Ampress Brick and includes the question of whether the business or property interests were intended to be protected from the antitrust violation alleged.

Before defining the scope of the standing issue and applying it to the facts of this case, mention must be made of one additional recent Supreme Court decision.

In Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court was again confronted with an issue similar to that raised in Illinois Brick. The plaintiffs in that action challenged the acquisition of several bowling centers by the defendant, a large manufacturer of bowling equipment. The plaintiffs were competitors of the acquired centers. The injury alleged was that the plaintiffs had lost profits by virtue of the acquisitions because the acquired/competing centers would have gone completely out of business had not the defendant purchased them. The Supreme Court dismissed the damage claims.

The issue presented as defined by the Court was whether the plaintiffs had sustained an injury for purposes of § 4. As in *Illinois Brick*, the inquiry again centered on legislative intent. The emphasis had shifted, however. Instead of deciding whether the plaintiffs possessed a business or property interest protected by § 4 as in *Illinois Brick*, the inquiry in *Brunswick* was addressed to whether the *injury* to the plaintiffs' business or property was of the type intended to be remedied by § 4. The Court concluded that it was not. "Thus, respondents' injury was not of 'the type that the statute was intended to forestall.'" *Id.* at 487–88, 97 S.Ct. at 697, *quoting Wyandotte Co. v. United States*, 389 U.S. 191, 202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967). The Court then concluded:

> We therefore hold that for plaintiffs to recover treble damages on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

*Id.* at 489, 97 S.Ct. at 697, *quoting Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

Although the Supreme Court did not categorize its inquiry in *Brunswick* under the issue of standing, it is clearly encompassed within the standing criteria announced in *Association of Data Processing Service Organizations, Inc., v. Camp, supra*. The reliance on *Wyandotte* and the cases cited in support of it, place the analysis under the standing issue.

In *Wyandotte* the Supreme Court had occasion to analyze its prior decisions which allowed civil actions based on violations of penal statutes. The Court stated that the actions were allowed "[b]ecause the interest of the plaintiffs in those cases fell within the class that the statute was intended to protect, and because the harm that had occurred was of the type that the statute was intended to forestall." A closer parallel to *Camp* would be hard to find. Additionally, the Court cited several cases in support of the proposition that an antitrust plaintiff must assert damages of the type the statutes were intended to forestall. *See*, 429 U.S. at 488, n. 13, 97 S.Ct. 690. In two of those cases, the complaints were dismissed because of a lack of standing on the part of the plaintiffs: *Reibert v. Atlantic Richfield Co.*, 471 F.2d 727 (10th Cir.), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973) and *Kirihara v. Bendix Corp.*, 306 F.Supp. 72 (Haw.1969).

It should be noted that the plaintiffs in *Brunswick* had standing to challenge the acquisitions in question at least for purposes of obtaining injunctive relief. This standing, however, was predicated on § 16 of the Clayton Act which involves different standing requirements. *See, Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *In re Multidistrict Vehicle Air Pollution M. D. L. No. 31*, 481 F.2d 122 (9th Cir. 1973).

The Ninth Circuit Court of Appeals has construed the *Brunswick* decision as one on standing. Its position in this regard was made clear in *Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495 (9th Cir. 1977), a decision rendered after both *Illinois Brick* and *Brunswick*.

The court, applying the "target area" approach to standing which it had adopted, stated that "[i]t is not enough to confer standing that plaintiff just prove some injury and show that this injury is within the affected area of the economy." What the plaintiff must show is that the injury it suffered "validate[s] the reasonable probability that a substantial anti-competitive effect upon the viability of competition in *that* market will flow from the condemned [activity]." *Id.* at 499 *quoting Kirihara v. Bendix Corp., supra*. The court then concluded:

Applying the analysis of *Brunswick, Blankenship* [*Blankenship v. Hearst Corp.*, 519 F.2d 418 (9th Cir. 1975)] and *Kirihara, supra,* to the facts and pleadings of this case as set forth by *Lenore,* we hold that *Lenore* lacks standing to challenge Olympia's acquisition of Hamm's and to recover treble damages. *Id.*

■ The above analysis establishes that antitrust plaintiffs must allege an injury in fact to their business or property which is within the area of the economy which would be endangered by the breakdown of competitive conditions as a result of the antitrust violation. In order to fall within the area of the economy defined above, the business or property interest injured must fall within the protection of § 4, *Illinois Brick, supra,* or as stated in *Kirihara, supra,* be "one of the components of the competitive infra-structure of the relevant market," and the injury sustained must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Brunswick, supra,* or as stated in *Kirihara, supra,* "validate the reasonable probability that a substantial anti-competitive effect upon the viability of competition in *that* market will flow from the condemned [activity]."

There are eleven plaintiffs to this action: Juneau Square Corp.; Wil-Ten Co., Inc.; Juneau Square Services, Inc.; Ralph W. Conway; Hal Bradley & Associates, Inc.; Emil Bartel; Anna Bartel; Vione Perry, as administratrix of the estate of Thomas H. Perry; Harold C. Smith, III, as administrator of the estates of Harold C. Smith, Jr. and Mildred B. Smith; Jack D. Moertl; and John F. Spoden. The defendants have attacked the standing of each plaintiff.

The plaintiffs allege that the defendants conspired to restrain the trade of office rental space in downtown Milwaukee by eliminating the plaintiffs as competitors in that market and preventing the completion of the Juneau Square Project though the use of unfair methods of competition. The conspiracy alleged was effectuated by restricting the plaintiffs' ability to compete in

the relevant market. As alleged by the plaintiffs, the defendants conspired to place the plaintiffs in a position where they would not be able to continue competing in the market unless they obtained additional financing and could not complete the proposed expansion without additional financing. The defendants then, in furtherance of the conspiracy, interfered with the plaintiffs' ability to obtain the needed financing. As a result of this interference and concomitant restriction on plaintiffs' ability to compete, the plaintiffs were excluded from the market.

■ Based upon the above analysis of standing and the nature of the violation alleged, the Court concludes that in order to establish standing in this action each plaintiff must show that it was in the business of providing office rental space to the consuming public and/or was developing such a business in the relevant market, *i. e.,* downtown Milwaukee, and that its "commercial interest" in this regard was injured by the conspiracy. Additionally, the injuries complained of and resulting damages sought must flow from the restriction placed on the plaintiffs' ability to compete in that market.

Juneau Square Corporation is the principal plaintiff in this action and its standing will be analyzed first. Juneau Square Corp. became the owner of certain real estate involved in this action and the sole developer of the office buildings to be built thereon on May 21, 1962. It was on that date that Wil-Ten Co., Inc., of which Juneau Square Corp. was a wholly-owned subsidiary, transferred to the principal plaintiff herein all "right, title and interests in and to the land, plans and specifications, leases, agreements to lease, development and all other assets in the Juneau Square project." PX 79.

The Corporation then proceeded over the following years to acquire additional real estate and to develop the properties by constructing two office buildings on the block. These buildings have been referred to as Juneau Square North and South.

The construction of the first phase of the project, Juneau Square South, was substantially completed in July of 1963. The corporation then began renting the office space in this building while continuing to develop North. Transcript p. 840. Construction of the second phase, Juneau Square North, was completed sometime prior to the fall of 1967 and tenants began to occupy this building during that period. Transcript p. 1027.

The development of the block was not complete, however. Plans were being developed and finalized for phase III, Juneau Square East.

■ There is sufficient evidence in the record of this case to the effect that Juneau Square Corporation was in the business of renting office space in the relevant market and was actively seeking to expand its business in that market.

The defendants have asserted basically three arguments against Juneau Square Corporation as a plaintiff to this action. These arguments are asserted against the remaining plaintiffs also, but since they are the only arguments raised against this plaintiff, they will be dealt with at this time.

The first argument borrows language from *Brunswick* to the effect that the antitrust laws are intended to protect *competition* and not *competitors,* and then concludes that since there has been no proof of public injury in this case, the injuries sustained by the plaintiff are "of no concern to the antitrust laws." The issue presented is addressed to the question of whether the restraint on competition alleged in this action is "unreasonable." The Court dealt with this issue in its memorandum and order of July 29, 1977 denying the defendants' motion for judgment N.O.V. and I decline to reconsider that order.

In their second argument, the defendants contend that the injuries sustained in this action were "entirely fortuitous." Paraphrasing a portion of the *Brunswick* opinion, they argue that under facts *similar* to those presented in this case, there would be no antitrust violation. In drawing the analogy, however, the defendants have misconstrued *Brunswick.*

In the portion of the *Brunswick* opinion referred to, the Supreme Court, after explaining that the acquisitions therein were unlawful because of the defendants' "deep pocket," noted that the loss alleged by the plaintiffs would have occurred even if the acquired centers had been purchased by "'shallow pocket' parents." The point being made was that the injuries did not flow from that which made the acquisitions unlawful. The fact of the existence of the antitrust violation was assumed in *Brunswick.*

The issue presented by the present motion on standing, as it relates to *Brunswick* is whether the injuries alleged flow from the antitrust violation. Although couched in the language of *Brunswick* and in terms of the type of the injuries alleged, the defendants' second argument is in reality addressed to the issue of whether the plaintiffs have alleged an antitrust violation and, in particular, whether the restraint involved was "unreasonable," not to the issue raised in *Brunswick.*

As stated above, the Court's position in regard to the reasonableness of the restraint has been discussed in an earlier opinion and will not be reconsidered here.

The third argument raised is addressed to the standing issue. At page 8 of their brief, the defendants state.

Even if defendants in this case were found to have violated Section 1 of the Sherman Act, the only fact which could have made their conduct unlawful would have been an increase in the price of, or a decrease in availability of office space. Only those persons or firms who were denied office space or who were required to pay a higher rent—not plaintiffs, who were owners and developers of office space rather than tenants or prospective tenants—could thus possibly recover for the violation charged.

The question presented is whether the plaintiffs' business or property interests which were injured fall within the protec-

tion of § 4. More precisely stated whether a competitor in the office rental market is protected by § 4, in view of the violation alleged. The Court would conclude that the plaintiffs are so protected. Competitors have been found to be protected by § 4 in situations, similar to that presented in this case, where the activity complained of resulted in a restraint of trade by restricting the ability of the competitor to compete in the market. *See, Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Southern Concrete Co. v. U. S. Steel Corp.*, 535 F.2d 313 (5th Cir. 1976); *Gough v. Rossmor Corp.*, 487 F.2d 373 (9th Cir. 1973); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 415 F.Supp. 176 (E.D.Pa.1976).

There has been no challenge in this action as to whether the injuries alleged were to the "business or property" of Juneau Square Corp., *i. e.*, to their "commercial interests." *See, Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). An injury in fact has been alleged and the Court has found that the plaintiffs fall within the protection of § 4. The only remaining issue is whether the damages sustained are "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." The Court finds that this test has also been met.

The injuries in this case flow from the restriction placed on the plaintiff's ability to compete in the relevant market. The damages which this plaintiff seeks are the lost profits and property from their business of renting office space. These injuries are of the type § 4 was intended to prevent. They are of the same character as the damages asserted in *Klor's, Inc., supra.*

The inquiry into the factual background of this lawsuit as it relates to *Wil-Ten Co., Inc.*, as a plaintiff in this action is somewhat obscured by the way in which the plaintiffs approached damages at the first trial.

The plaintiffs assert the standing of Wil-Ten on the following bases.

(a) Wil-Ten itself was the owner, in active possession, of a substantial *property* interest in Juneau Square;

(b) Wil-Ten itself directly engaged in the *business* of developing the Juneau Square office building complex;

(c) Wil-Ten is in the *target area* and was *specifically and purposely "aimed at"* by the conspiracy;

(d) Wil-Ten was *directly* injured.

Prior to analyzing each of these points a comment must be interjected concerning the status of Wil-Ten as the sole stockholder of Juneau Square Corp. Although the plaintiffs state in their brief that they are not relying on this status to establish standing, they assert that it is sufficient to confer standing. They rely on *Perkins v. Standard Oil Co.*, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), for this proposition.

The plaintiffs have misinterpreted *Perkins.* The plaintiff in that case was the sole owner of several corporations which had been driven out of business by the defendants' act. The similarity between that case and the one presently at bar ends at that point, however. The antitrust violation alleged in that action was directed against the parent; it was Perkins himself who was forced to purchase the defendants' products at discriminatory prices. To the extent that the violation was also aimed at the subsidiary corporations and their claims were being asserted, the standing of Perkins to raise those claims himself was not based on his status as their sole shareholder. Perkins had received assignments from the two corporations and asserted those claims as an assignee. *See, Standard Oil Co. v. Perkins*, 396 F.2d 809, 811 n. 1, 813–12 (9th Cir. 1968). The standing of Perkins, based solely on the fact that he was the sole stockholder of the two corporations was neither raised nor litigated.

The first portion of the *Perkins* opinion deals with the second and third cause of action asserted in the complaint, *i. e.*, the assigned claims. The issue was whether those claims are encompassed by § 2 of the Clayton Act, not whether the proper party was asserting the claims. The second por-

tion of the opinion deals with the individual claim of Perkins, the first cause of action. The plaintiffs have cited that section of the opinion which states:

It is clear in this case, however, that Perkins was no mere innocent bystander; he was the principal victim of the price discrimination practiced by Standard. Since he was directly injured and was clearly entitled to bring this suit, he was entitled to present evidence of all of his losses to the jury. 395 U.S. at 649–50, 89 S.Ct. at 1875.

A reading of the circuit court opinion reveals that even here the court of appeals agreed that Perkins had suffered compensable injuries under section 4. The dispute was over the extent of the injuries which could be claimed in an antitrust action. The lower court had concluded that some of the damages claimed did not constitute "direct . . . injury to business or property within the meaning of Section 4 of the Clayton Act." 396 F.2d at 815. The Supreme Court, however, held that once it was established that Perkins was "directly injured," the plaintiff "was entitled to present evidence of all of his losses to the jury." This later statement is somewhat impaired, in the Court's view, by the *Brunswick* case discussed above. If the defendant in *Brunswick* had, after the period of increased competition which was found to have existed in that case, utilized its "deep pocket" to restrict competition and thereby inflicted a loss on the plaintiff, the later damages would apparently be compensable under § 4 but the "loss" which occurred during the period of increased competition would nevertheless be outside the scope of § 4 and not be compensable.

■ The Court would conclude that Wil-Ten's ownership as such of Juneau Square Corporation is insufficient to establish standing.

The plaintiffs' first basis for standing as to Wil-Ten is that it "was the owner, in active possession, of a substantial *property* interest in Juneau Square." As stated above, on May 21, 1962, Wil-Ten transferred all of its interests in Juneau Square to its wholly-owned subsidiary. Wil-Ten's property interest now referred to concerns the Vartanian property.

Plaintiff's exhibit 70 indicates that the Vartanian parcel was purchased by Juneau Square Corp. in November or December of 1965 at a price of $250,000. The corporation paid $50,000 in cash and gave the sellers a note and first mortgage on the property for the balance. Title to the property was taken in the name of Tennie Conway on August 26, 1966. The deed was recorded on September 20, 1966.

The following November, Tennie Conway deeded the property to Juneau Square Corp. which in turn executed a deed in favor of Wil-Ten which then executed a deed in favor of Harold C. Smith and his wife. All of these deeds were executed on November 1, 1966. None of these deeds were recorded at that time.

On June 2, 1969, the deed from Conway to Juneau Square Corp. was recorded and Juneau Square Corp. granted a second mortgage on the land to Northwestern Elevator in the amount of $100,000. Subsequently, the deed from Wil-Ten to the Smiths was recorded on November 20, 1969 and the deed from Juneau Square to Wil-Ten on April 28, 1972.

The transfer of the property from Wil-Ten to the Smiths involved an exchange of land and a lease agreement between these parties. The agreement granted to Wil-Ten a lease on the Vartanian property for a period of 50 years. The rent was set at $5.00 per year to be increased to $22,500 per year on November 1, 1973. Wil-Ten retained the right to repurchase the property during the term of the lease for $275,000.

It is this leasehold interest in the property and the right of repurchase which the plaintiffs contend establish Wil-Ten's standing.

■ The second basis for standing asserted is closely related to the first. The plaintiffs assert that "Wil-Ten itself directly engaged in the business of developing the Juneau Square office building complex." In this section of their argument, the plain-

tiffs state that Wil-Ten "invested" the profits from a sale of a building owned by Wil-Ten into the project and that it was obligated to the Vartanians on its note for the purchase of the Vartanian parcel. Additionally, they contend that Wil-Ten provided architectural and engineering services and shared its management, Mr. Moertl and Mr. Spoden, with Juneau Square Corp. in the development of the project.

The plaintiffs have taken the position that ownership of any type of interest in the "project" is sufficient to confer standing. Although the plaintiffs assert this position in favor of Wil-Ten's standing, they have not sought to establish damages measured by the diminished value of the ownership interest claimed. What they have sought as damages in reference to the Juneau Square Project is the profits which would have been made had the long-term financing been obtained and phase three completed. There has been no evidence presented which would establish Wil-Ten's right to any of these profits directly. Its only apparent right to these profits is by virtue of its ownership of Juneau Square Corporation. This ambiguity is compounded by the fact that the plaintiffs have never detailed which of the plaintiffs are asserting damages for loss of the profits from the three buildings. Whether or not Wil-Ten Co., Inc., is asserting these damages is unclear to the Court.

The evidence pointed to by the plaintiffs, which seeks to establish that Wil-Ten was in the business of developing office rental space in the Milwaukee market, is insufficient to establish that fact. The "investment" by Wil-Ten of the profits from the sale of a Minneapolis building is not explained. Whether this "investment" was a gift to its subsidiary or a loan or the purchase of an equity interest entitling Wil-Ten to a share of the profits is not explained.

Wil-Ten also asserts that it "gave the Vartanian family a note (as part of the purchase price on the Vartanian parcel) on which Wil-Ten was obligated directly to the Vartanians in the amount of $196,500."

Plaintiffs' exhibit 70, however, states that the Vartanian parcel was purchased with $50,000 cash and $200,000 "paid by a note of Juneau Square Corp."

The Vartanians subsequently assigned this note to Marshall-Wisconsin, Inc., on May 23, 1972. The principal amount left owing at that time was $196,500. The import of this "investment", together with the tax payments on the parcel, is again left unexplained. The architectural and engineering services provided by Wil-Ten "to the project" must be viewed in a similar fashion. What interest Wil-Ten received in exchange for these services is simply unknown.

It would appear that each of the three instances of investments by Wil-Ten "in the project" constitute an infusion of capital into Juneau Square Corp. and that Wil-Ten retained no right of reimbursement from Juneau Square Corp. Such a state of facts cannot be interpreted as establishing Wil-Ten's business of developing office rental space in the relevant market.

The final point raised by Wil-Ten to establish that it was a co-developer of the project is that it shared its management with Juneau Square Corp. The management which Wil-Ten shared was in the persons of Mr. Moertl and Mr. Spoden who were also the principal operating officers of Juneau Square Corp. Whether these officers were working for Wil-Ten or Juneau Square Corp. or both at any particular time is an illusory concept. Additionally, there has been no evidence as to what interest Wil-Ten was to receive for sharing its management.

The difficulty presented by the above discussion is compounded by the damages asserted in this action. As noted above, damages for the diminished value of Wil-Ten's leasehold interest have not been asserted. Nor have damages, tied directly to the "investment" of the profits from the sale of the Minneapolis building or the shared management been asserted. Damages linked to the Vartanian note and the architectural and engineering services have been asserted. These damages were grouped under a

heading entitled "Wil-Ten Co., Inc., et al Notes and Debts Payable." Mr. Moertl characterized these debts as follows:

> These are Wil-Ten Co., Inc., and others. It's really a form of a limited partnership, that it's an association of interest that were grouped together at such time as foreclosure litigation really peaked, let's say, as of June 1, 1970, and represents the obligations that these—that Wil-Ten *and Juneau Square Corp.* owes as of that time. . . . This association or Wil-Ten Associates *assumed* these obligations. Trial transcript pp. 2517–18. (emphasis added).

It is not altogether clear exactly who is seeking recovery for these damages; Wil-Ten Co., Inc., Wil-Ten Associates, or Juneau Square Corp. The assumption of these liabilities by the Association has not been made clear to the Court.

Wil-Ten's third basis for standing is that it was within the "target area" and "aimed at" by the conspiracy. The argument presented in this section of the brief is based on the allegation that "Wil-Ten was in the business of producing office space for the very market in which the defendants sought to restrain competition." As stated above, this fact has not been established.

The final argument presented is that Wil-Ten was "directly" injured. This argument is one addressed to the issue of causation, which as discussed above, is not within the scope of standing.

■ The factual setting of this action as it pertains to Wil-Ten's standing to assert damages is far from clear. The nature and extent of its damage claims is also uncertain. Because of this ambiguity, the Court is simply unable, even at this late date, to conclude whether or not Wil-Ten has standing in this action. The Court will not, therefore, at this time dismiss Wil-Ten as a plaintiff in this action for lack of standing. This issue will be left for trial.

While there is confusion concerning some of the damages claimed by Wil-Ten in this action, one area of damages and its basis is sufficiently clear to permit a ruling on standing.

■ Wil-Ten contends that its business of developing buildings for Mutual of Omaha and Eastman Kodak Co. throughout the country was injured by the conspiracy alleged in this action. Its position in this regard is set forth at pages 2539 through 2551. The plaintiff contends that its business in this regard was injured because its principal officers, Mr. Moertl and Mr. Spoden, were so occupied with the foreclosure actions begun against Juneau Square Corp. that they were unable to effectively manage the business of Wil-Ten. It is clear that these claims must be dismissed from this action.

The injury alleged in this damage claim is not to a commercial interest within the relevant market. Additionally, assuming that Wil-Ten has a commercial interest in the relevant market, the injury alleged does not flow from the restriction placed on its ability to compete in that market. Such a restriction does not naturally result in an inability to manage other commercial interests of the plaintiff and does not "validate the reasonable probability that a substantial anti-competitive effect upon the viability of competition in *that* market will flow from the condemned [activity]." *Kirihara v. Bendix Corp.,* 306 F.Supp. at 90. As such, these losses are of no concern to the antitrust laws.

■ Juneau Square Services, Inc. has also asserted standing to maintain a damage action pursuant to § 4 against the defendants. This plaintiff apparently held a lease on the gas station and parking garage located on the Juneau Square block. The verdict form utilized at trial included individual questions as to each plaintiff regarding causation and damages. Juneau Square Services was not listed. Although the plaintiffs objected to the procedure of requesting separate damage findings for each plaintiff, they did not specifically object to the failure to include Juneau Square Services.

The damages claimed by this plaintiff are unclear. The plaintiffs presented evidence

of the loss of profits which would have been realized had a proposed parking structure been built. They did not, however, identify which of the plaintiffs was claiming these damages. Apparently, these profits were to have gone to Juneau Square Services, Inc. after they had leased the new structure from Juneau Square Corporation. The arrangement in this regard, however, was not made clear at trial.

The plaintiffs' brief in opposition to the instant motion at page 23 indicates that the damages sustained to Juneau Square Services was the loss of its existing business not loss of future profits. No damage evidence of this type of injury was presented at trial, however.

Whether the Court considers the injury to be to this plaintiff's existing business or to its future business the result is the same. The Court must conclude that this plaintiff has no standing. It was not in the business of providing office rental space nor was it planning to enter the market. It had no commercial interest within the area of the economy threatened by the conspiracy. Juneau Square Services, Inc. will, therefore, be dismissed as a plaintiff to this action.

The standing of Ralph W. Conway; Emil and Anna Bartel; Vione Perry, as administratrix of the estate of Thomas H. Perry; and Hal Bradley & Associates, Inc. will be considered together since their interests in this action are identical.

These plaintiffs purchased a percentage of the ownership of the real estate known as "Juneau Square North" and "Juneau Square South" in late 1965 and early 1966. The total percentage of all of these plaintiffs totaled 25 percent. Simultaneously with these purchases, the plaintiffs entered into identical contracts providing for a lease of the property purchased back to Juneau Square Corporation and an agency agreement with Juneau Square Corporation. These agreements were plaintiffs' trial exhibits 102 through 105.

These plaintiffs assert that they were joint venturers with Juneau Square Corporation in the two buildings identified above

and as such were in the business of providing office rental space in the relevant market. If this fact can be established, their standing is identical to that of Juneau Square Corporation as it relates to the two buildings. An analysis of the contracts referred to above and the damages claimed by these plaintiffs is in order.

The lease agreement entered into between the plaintiffs and Juneau Square Corporation provided that the corporation was to receive a 50-year lease of all property purchased and a right to renew the lease for a period of 49 years. Rental payments on the lease were set at a figure equaling 10 percent of the purchase price paid by each plaintiff per year or 10 percent of "the net rental received during said twelve (12) month period from the tenants of [Juneau Square North and South]," whichever is greater.

The agency agreements provide for the formation of a joint venture for the purpose of "holding, administering and otherwise dealing with the ownership of [Juneau Square North and South]." Each plaintiff appointed Juneau Square Corporation as its agent "for the joint venture in the holding, administering and otherwise dealing with the ownership of the property." The agreement then stated: "All profits and losses arising from the ownership of the Property shall be shared in proportion to the respective fractional interest of each of the parties hereto."

The standing analysis of these plaintiffs hinges on whether they are regarded as part owners of the business or mere lessors whose rentals were tied to the profits of the business.

Again the approach to damages utilized at the first trial obscures the issue. Exactly what damages these plaintiffs are asserting has not been made clear. The plaintiffs, as stated previously, simply sought to establish the lost profits for "the project" without specifying which of the plaintiffs were entitled to these profits. The rental payments due to the joint venturers does appear as an item of damages, but it appears as a compensable debt of Juneau

Square Corporation rather than as damages owing to the joint venturers directly from the defendants. The plaintiffs' theory in this regard is somewhat curious and was stated by Mr. Moertl at pages 2529–28 of the trial transcript. The witness referring to the $250,000 investment by the joint venturers stated:

We have always considered this as a debt and considered that it would be repaid; in fact, if we so chose we could have repaid it and not had them participate any further as investors; however, it was never our intention to exercise that right. We felt that it was at their option whether they would be repaid or stay in as investors.

Exactly who the "we" refers to is not clear. This testimony would appear to be in conflict with exhibits 102 through 105.

Additionally, any profits owing to the joint venturers would be limited to the profits from North and South. The lost profits of these two buildings alone, however, were not established. The damages for loss of profits for the two existing buildings and the proposed third building were treated as one unit without a breakdown as to each building.

The standing of a lessor whose tenants are the victims of an antitrust violation and whose rentals are tied to the profits of its lessee has received a considerable amount of attention by the federal courts. *See, Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292 (2d Cir. 1971) and cases cited therein.

The Court need not analyze these cases nor attempt to reconcile them with the cases discussed earlier in this opinion in addressing the standing of these joint venturers. The Court would find that they are more than mere lessors of real estate.

The two agreements noted above when read in conjunction with each other sufficiently establishes, in the Court's opinion, that these plaintiffs were in the business of providing office rental space in the relevant market. They were entitled to a percentage of the profits in relation to their investment and were to share in any losses. They had the right to participate in managerial and administrative decisions through their agent appointed for that purpose. Although the issue is not entirely free from doubt, the Court finds that the joint venturers were in a business within the threatened area of competition. Their standing is identical to Juneau Square Corporation and their damage claims for lost profits are maintainable under § 4.

■ The standing of Harold C. Smith, III, administrator of the estates of Harold C. Smith, Jr. and Mildred B. Smith, is based on the Smiths' interest in the Vartanian parcel. Their interest in this land is set forth in plaintiffs' trial exhibit 111.

On November 2, 1966, the Smiths purchased the Vartanian parcel giving in return therefor some real estate which they owned near Mellen, Wisconsin. Simultaneously with this purchase, the Smiths leased back to Wil-Ten the Vartanian parcel "for a term not less than 50 years at an annual rental of $5.00 per year . . . which rental shall be increased to . . . $22,500 per year for the [Vartanian parcel], commencing November 1, 1973." Wil-Ten also retained a right to repurchase the land at a fixed dollar figure for the term of the lease.

The plaintiffs contend that the diminution in the value of this parcel to them is a compensable antitrust injury.

The Court has not been able to trace this alleged injury to any damage claim asserted at trial. It appears clear that the Smiths were not entitled to any of the lost profits and the damage claims in this regard are asserted by plaintiffs other than the Smiths. Nor does any other damage claim asserted relate to the Smiths.

There has been no evidence presented which would place the commercial interest of the Smiths within that area of the economy effected by the conspiracy to restrain the trade of office rental space. They were simply lessors of real estate. Even the status of their lessee, Wil-Ten Corp., as a victim of the antitrust violation is, as discussed above, questionable.

The status of this plaintiff as a lessor of the property with a fixed dollar rental is insufficient to confer standing and he must be dismissed as a plaintiff in this action. *Calderone Enterprises Corporation v. United Artists Theatre Circuit, supra;* see *Congress Building Corp. v. Loew's, Inc.,* 246 F.2d 587 (7th Cir. 1957); *Steiner v. 20th Century-Fox Film Corp.,* 232 F.2d 190 (9th Cir. 1956).

The only remaining plaintiffs are Mr. Jack D. Moertl and Mr. John F. Spoden. As to the standing of these plaintiffs, their brief states:

> The plaintiffs have not pursued any claims on behalf of Jack D. Moertl and John F. Spoden individually because such claims are derivative, and they will be made whole by properly compensating Juneau Square Corp. and Wil-Ten. We therefore do not oppose the motion to dismiss Messrs. Moertl and Spoden as parties.

The motion to dismiss these plaintiffs will, therefore, be granted.

For the reasons stated above, the defendants' motions are granted in part and denied in part. Juneau Square Services, Inc., Harold C. Smith, III, Jack D. Moertl and John F. Spoden are dismissed as plaintiffs from this action. The motion to dismiss Wil-Ten Co., Inc., for lack of standing is stayed. The damage claims of Wil-Ten Co., Inc. relating to its commercial interest in projects other than the Juneau Square project are dismissed.

SO ORDERED this 22nd day of February, 1978, at Milwaukee, Wisconsin.